# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## CIVIL ACTION NO. 3:22-CV-00003-KDB-DCK

| | |
|---|---|
| **FELICIA MORGAN, individually, and as *Guardian Ad Litem* of BOBBY MORGAN, an incompetent person,** | |
| **Plaintiff,** | |
| **v.** | **ORDER** |
| **CITY OF CHARLOTTE; EDWARD GONZALEZ; DEREK RUD; AND JOSHUA SKIPPER,** | |
| **Defendants.** | |

Felicia Morgan, individually and as *Guardian Ad Litem* of Bobby Morgan, has brought this action against three Charlotte, North Carolina police officers and the City of Charlotte ("Defendants"), claiming that the Officers used excessive force against her "incompetent" adult son. On December 1, 2018, officers with the Charlotte-Mecklenburg Police Department ("CMPD") responded to a "911" emergency call by Bobby Morgan stating that he was in a dispute with his neighbors and that he would be waiting outside with his legally possessed firearm. The situation ultimately escalated into an armed standoff between Bobby Morgan and CMPD officers in which Morgan was shot multiple times and suffered significant, but non-fatal, injuries. Now before the Court are the Defendants' Motions for Summary Judgment, (Doc. Nos. 57, 59, 61, 63), and the joint Motion to Strike Plaintiff's expert report (Doc. No. 86). The Court has considered the motions, the parties' briefs and exhibits, the Officers' body camera videos, and the arguments

1

of counsel at a motions' hearing on June 1, 2023. For the reasons discussed below, the Court will grant the Motion to Strike and the Defendants' Motions for Summary Judgment.

## I. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *United States v. 8.929 Acres of Land in Arlington Cnty., Virginia*, 36 F.4th 240, 252 (4th Cir. 2022) (quoting Fed. R. Civ. P. 56(a)); *see United States, f/u/b Mod. Mosaic, LTD v. Turner Construction Co*., *et al*., 946 F.3d 201, 206 (4th Cir. 2019). A factual dispute is considered genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *8.929 Acres of Land,* 36 F.4th at 252. "A fact is material if it might affect the outcome of the suit under the governing law." *Id*., (quoting *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013)).

The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact through citations to the pleadings, depositions, answers to interrogatories, admissions, or affidavits in the record. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (when the nonmoving party "has failed to make a sufficient showing on an essential element of [his] claim with respect to which [he] has the burden of proof," summary judgment is warranted); *United States ex rel. Gugenheim v. Meridian Senior Living, LLC*, 36 F.4th 173, 178 (4th Cir. 2022). If the movant satisfies his initial burden to demonstrate "an absence of evidence to support the nonmoving party's case," the burden shifts to the nonmovant to "present specific facts showing that there is a genuine issue for trial." *8.929 Acres of Land,* 36 F.4th at 252, quoting *Humphreys & Partners Architects, L.P. v. Lessard Design, Inc.*, 790 F.3d 532, 540 (4th Cir. 2015). "The mere existence of *some* alleged factual dispute between the parties will not defeat an

otherwise properly supported motion for summary judgment. *Hixson v. Moran*, 1 F.4th 297, 302 (4th Cir. 2021). Rather, the nonmoving party must establish that a material fact is genuinely disputed by, *inter alia*, "citing to particular parts of the materials of record" and cannot rely only on "conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." Fed. R. Civ. P. 56(c)(1)(A); *8.929 Acres of Land*, 36 F.4th at 252, quoting *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013).

Still, summary judgment is not intended to be a substitute for a trial of the facts. *Anderson*, 477 U.S. at 249. In determining whether summary judgment is appropriate, "courts must view the evidence in the light most favorable to the nonmoving party and refrain from weigh[ing] the evidence or mak[ing] credibility determinations." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal quotation marks omitted) (quoting *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017). "Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits." *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568-69 (4th Cir. 2015) (quoting 10A Charles Alan Wright & Arthur R. Miller et al., Federal Practice & Procedure § 2728 (3d ed.1998)). In the end, the relevant inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## II.     FACTS AND PROCEDURAL HISTORY

On December 1, 2018, at about 8:30 a.m., Bobby Morgan called "911" seeking help because of an ongoing dispute with his neighbors. *See* Doc. No. 34, ¶ 53. While speaking with Morgan, the dispatcher recorded that Morgan was experiencing a mental health crisis and claimed to be armed. *See* Doc. No. 63-7. CMPD Officers Joseph Ellis and Jensen Tilson were the first on

3

the scene, and both were aware of the dispatcher's notes. *See* Doc. No. 63-1, 63-2. Also, Tilson shared with Ellis that Morgan had mental health issues[1] and had been cooperative in the past. Doc. No. 63-1. The officers knocked on the front door, but no one answered. Doc. No. 63-4. When Morgan eventually appeared from the side of the residence, he identified himself as a police officer, gave Tilson and Ellis a badge number, and stated his house was under FBI surveillance. *See* Doc. No. 63-4; Doc. No. 60-6. Morgan also informed Officers that he had smoked marijuana before their arrival. *Id.* While explaining the dispute with his neighbors, Morgan dropped what looked like a real firearm, with the hammer cocked, from his jacket to the ground. *See* Doc. Nos. 60-5, 60-6; Doc. Nos. 57-3, 57-4. The Officers allowed Morgan to pick up the firearm and put it back in his jacket. *See* Doc. Nos. 63-1, 63-4.

Ellis continued to speak with Morgan while Tilson went to speak with the neighbors. Doc. No. 63-4. Morgan then began to threaten to shoot and kill his neighbors. *See id.*; Doc. Nos. 57-3, 57-4. Ellis tried to have Morgan go into his residence to deescalate the situation, but Morgan did not comply. Doc. No. 63-3. Morgan then walked over to Tilson, handed him a piece of mail, and told his neighbors that he would blow their heads off. Doc. Nos. 63-1, 63-4. At this point Tilson attempted to grab Morgan's wrist and take him into custody but Morgan retreated into his residence. *See* Doc. No. 57-3. About five minutes after Morgan entered the residence, a gunshot was heard. *Id.* Both Officers drew their weapons and found cover. *See* Doc. No. 63-1. Ellis then radioed "shots fired." *Id.*

Numerous CMPD officers converged on the scene. *Id.* Sometime after the residence had been surrounded, Morgan's mother — Felicia Morgan — breached the police barricade and

---

[1] Morgan was diagnosed with schizoaffective disorder and bipolar disorder when he was sixteen. *See* Doc. No. 74-1. He was declared incompetent in 2015. *Id.*

4

attempted to enter the residence. *See* Doc. No. 63-13. Ms. Morgan told officers that Morgan did not have a gun and repeatedly attempted to enter the residence. *Id.* Ms. Morgan ultimately had to be restrained by the CMPD to prevent her from entering the residence. *Id.*

Officers Edward Gonzalez and Joshua Skipper were among the officers who responded to the Morgan residence. *See* Doc. No. 63-1. Within minutes of his arrival, Skipper heard a gunshot coming from the direction of Morgan's residence. Doc. No. 63-6. Skipper then took up a position near the rear of Morgan's residence in a neighbor's yard. *Id.* Skipper testified that he observed Morgan walk outside the residence and then walk back inside. *Id.* Skipper was then advised over the radio that Morgan had appeared in the front window holding a chrome handgun. *Id.* Soon after, Skipper heard gunshots coming from the direction of Morgan's residence. Skipper saw Morgan with a gun in his hand and ordered him to "drop the gun, drop the gun, drop the gun." *Id.* Morgan did not drop the gun. *Id.* Rather, Skipper alleges that Morgan raised his gun and pointed it at him. *Id.* Skipper responded by firing three or four shots at Morgan, none of which hit Morgan. *Id.* Morgan reentered the residence, and Skipper advised over the radio that he had discharged his weapon. Morgan then appeared in the front window of the residence several times. *See* Doc. No. 63-1. Gonzalez, with his patrol rifle, watched the front of the residence and allegedly saw Morgan shooting what he perceived to be real rounds from the window. *Id.* When he noticed Morgan firing, Gonzalez fired one round in response. *Id.* It is unclear if this round hit Morgan. *See* Doc. Nos. 63-5, 63-8.

At this point, Officer Rud, a sniper with CMPD SWAT, came on the scene. Doc. Nos. 63-1, 63-8. Rud noticed Gonzalez positioned behind a tree. Doc. No. 63-8. Rud approached Gonzalez to let him know that he would be having another SWAT officer come and relieve Gonzalez from his position. *Id.* Gonzalez told Rud in which window of the residence Morgan had been seen. *Id.*

Rud positioned himself partially underneath a car that was in a driveway across the street. *Id*. As he began watching the house, he knew that CMPD officers had allegedly exchanged gunfire with Morgan and that Gonzalez had fired one round at Morgan. *Id*. Rud surveyed the front of Morgan's residence through the scope on his rifle and saw Morgan appear in the window in possession of what looked like a flare gun and a handgun. *Id*.

At that time, Rud heard over the radio that SWAT Officer Thompson was coming to relieve Gonzalez from his position. *Id*. Rud then allegedly saw Morgan in a shooting stance pointing his firearm in the direction of Gonzalez and Thompson. Rud testified that he perceived an imminent threat to these officers and, consequently, fired a round at Morgan. *Id*. Morgan flinched but remained in a shooting stance in the window. Rud then fired another round. *Id*. After Rud fired his second round, Morgan was no longer in the window. Within two minutes, Morgan came out of his residence and was immediately taken into police custody. Doc. Nos. 63-1, 63-8. After he surrendered, police Officers and medical personnel provided Morgan with medical assistance in his yard, and he was transported to the hospital for further medical attention. Doc. No. 63-1. It was later determined that the weapon possessed by Morgan was not a real firearm but a prop gun that simulated the sound of gunfire. *See* Doc. No. 71-15.

After being released from the hospital, Morgan was charged with two counts of communications of threats and one count of assault with a deadly weapon on a government official. Doc. 57-11. Ultimately, the Mecklenburg County District Attorney's Office dismissed the criminal charges against Morgan. Doc. 34, ¶ 222. The City of Charlotte and the Mecklenburg County District Attorney's Office reviewed the actions of Gonzalez, Skipper, and Rud. Doc. 58-2; 57-13. Both reviewing agencies, independently, found the use of force to be justified under the totality of the circumstances. *Id*.

Plaintiff sued the Defendants in Mecklenburg County Civil Superior Court on November 30, 2021. Doc. No. 1. The matter was removed to this Court on January 3, 2022. *See* Doc. No. 1-2. Exactly one year later, Plaintiff amended her Complaint within the (extended) time set by the Court in the pretrial order, adding Joseph Ellis and Jensen Tilson as defendants. *See* Doc. No. 34. On March 27, 2023, the Defendants filed their Motions for Summary Judgment. *See* Doc. Nos. 57, 59, 61, 63. Also, Ellis and Tilson filed a Motion to Dismiss, which the Court granted on May 10, 2023. Doc. No. 86. On May 15, 2023, the remaining Defendants jointly moved to strike Plaintiff's Expert Report arguing that it was untimely disclosed. *See* Doc. No. 86. All the pending motions have been fully briefed and are now ripe for the Court's consideration.

## III. DISCUSSION

### A. Motion to Strike

The Defendants have jointly moved to strike Plaintiff's second or "supplemental" expert report. *See* Doc. No. 86. The Defendants argue that the report's disclosure was untimely and that the report comes as a surprise because the initial expert report did not address the conduct of any of the remaining Defendants. Plaintiff responds that the "supplemental expert report" fully complied with the Federal Rules of Civil Procedure and the admission of the report will not prejudice the Defendants. *See* Doc. No. 91-1.

Federal Rule of Civil Procedure 26(a)(2)(A) requires litigants to disclose "the identity of any witness [she] may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Rule 26(a)(2)(B) further requires litigants to produce written reports, signed by the witness, for any witness who is "retained or specially employed to provide expert testimony in the case" or "whose duties as the party's employee regularly involve giving expert testimony." Fed. R. Civ. P. 26(a)(2)(B). This written report must include:

> (i) a complete statement of all opinions the witness will express and the basis and reasons for them; (ii) the facts or data considered by the witness in forming them; (iii) any exhibits that will be used to summarize or support them; (iv) the witness's qualifications, including a list of all publications authored in the previous 10 years; (v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition; and (vi) a statement of the compensation to be paid for the study and testimony in the case.

*Id*. Under Rule 26(e), a party's duty to supplement its expert report extends both to information included in the report and to information given during the expert's deposition. Fed. R. Civ. P. 26(e). Rule 26(e) permits supplemental reports only for the narrow purpose of correcting inaccuracies or adding information that was unavailable at the time of the initial report. *See Barnett v. United States*, No. 2:20-cv-02517-DCN, 2021 U.S. Dist. LEXIS 237713, at *5 (D.S.C. Dec. 13, 2021)

Rule 37 (c)(1) forbids the use of improperly disclosed or supplemented information in motions, hearings, or trials, unless there is a substantial justification for the failure to disclose or supplement, or if that failure is harmless. Fed. R. Civ. P. 37(c)(1); *S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). District courts have wide discretion when ruling on issues of discovery, including discretion when ruling on motions to strike. *See Saudi v. Northrop Grumman Corp*., 427 F.3d 271, 278–79 (4th Cir.2005) (quoting *S. States,* 318 F.3d at 595). The Fourth Circuit instructs courts to consider several factors when applying Rule 37(c)(1) and deciding whether to exclude untimely produced evidence such as (1) the nature of surprise brought by the untimely submission; (2) the ability of the parties to "cure" the element of surprise; (3) the extent to which allowing the testimony would disrupt the trial; (4) the submitting party's justification for its late disclosure; and (5) the relative importance of the testimony at issue. *S. States*, 318 F.3d at 596–97; *and see Burlington Ins. Co., v. Shipp*, 2000 WL 620307, at *4 (citing *Adalman v. Baker, Watts & Co.*, 807 F.2d 359, 369 (4th Cir. 1986); *Rambus, Inc. v. Infineon Techs.*

*AG*, 145 F. Supp. 2d 721,725 (E.D. Va. 2001); *see also Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co*., 170 F.3d 985, 993 (10th Cir. 1999)).

Weighing these various rules and factors, the Court will exercise its discretion to grant the motion to strike. To begin with, Plaintiff does not actually seek to "supplement" an expert report as to these Defendants because no initial expert report exists to be supplemented. Plaintiff's only timely filed expert report focuses solely on the conduct of Officers Ellis and Tilson. *See* Doc. No. 86-4. Supplemental reports amend *existing* expert reports to correct inaccuracies and add relevant information that was previously unavailable. They do not raise novel issues or arguments that are untethered to the initial report. They also "[do] not cover failures of omission because the expert did an inadequate or incomplete preparation." *Akeva, LLC. v. Mizuno Corp*., 212 F.R.D. 306, 310 (M.D.N.C. 2002). Accordingly, Plaintiff's second expert report cannot fairly be described as a supplemental report. Rather, it is an untimely initial expert report.

Turning to the factors under Rule 37(c)(1), the Court finds on balance that they support striking the untimely report. First, the report came as a surprise. Along with the fact that the initial report only addressed the actions of Ellis and Tilson, Plaintiff's designation of her expert witness likewise focused exclusively on Ellis and Tilson. *See* Doc. No. 91-4. Given the focus on Tilson and Ellis, it was reasonable for the remaining Defendants to assume that Dr. Reese would not be opining on their actions. Plaintiff also waited until filing her opposition to the motions for summary judgment to attach the second expert report as an exhibit. The belated and unusual manner in which this report was disclosed only adds to Defendants' surprise. Also, the only meaningful cure — allowing the parties to reopen discovery to depose Dr. Reese and perhaps conduct follow up related discovery — would disrupt the scheduled mid-July 2023 trial by delaying the Court's ruling on the Defendants' motions and trial.

Next, Plaintiff's justification for the untimely disclosure is unconvincing. Plaintiff argues that the City's initial discovery responses were incomplete, and Plaintiffs' initial expert report was due before a single deposition was scheduled. However, Dr. Reese opined on the conduct of Ellis and Tilson without the aid of depositions, issuing his initial report, six weeks before Ellis and Tilson were deposed. *See* Doc. No. 63-3, 63-4. Plaintiff also failed to move for an extension of time to file her expert report, which the Court would likely have granted. Moreover, while the Defendants may not have been deposed by the expert report deadline, some information (which Dr. Reese ultimately relied on) was already available to Plaintiff and consequently to Dr. Reese. *See* Doc. No. 69-10. Simply put, if Dr. Reese had sufficient information to opine on the conduct of Ellis and Tilson, it follows that he could at the same time have, at least preliminarily, opined on the conduct of Rud, Skipper, and Gonzalez.

Lastly, the relative importance of the testimony weighs against the Plaintiff. Dr. Reese opines on the conduct of non-defendant officers who did not fire any shots that hit Morgan, ballistics, scene reconstruction, and whether the officers were reasonable in firing their weapons. This testimony is irrelevant (and therefore inadmissible), outside his area of expertise, or touches on the ultimate question the jury will be asked to answer. *See Sun Yung Lee v. Zom Clarendon*, L.P., 453 F. App'x 270, 278 (4th Cir. 2011) ("While expert witnesses may testify as to the ultimate matter at issue…this refers to testimony on ultimate facts; testimony on ultimate questions of law, i.e., legal opinions or conclusions, is not favored."). Therefore, while some of his testimony may be important to the Plaintiff's case, most of it is not. Furthermore, if the Court adopts Plaintiff's view of the importance of this testimony it only reinforces the prejudice caused by the untimely nature of its filing. In sum, having considered the relevant factors, the Court finds that Plaintiff has failed to offer a convincing justification for the late disclosure and Defendants will be unduly

prejudiced by the admission of the untimely report. The Court will therefore grant the Motion to Strike.

### B. Motions for Summary Judgment

Plaintiff has asserted claims against the Defendants for: (1) Battery; (2) Intentional Infliction of Emotional Distress; (3) Negligent Infliction of Emotional Distress; (4) Negligence/ Gross Negligence;[2] (5) Malicious Prosecution;[3] (6) Failure to provide reasonable accommodations under the Americans with Disabilities Act; and (7) Excessive force and failure to train under 42 U.S.C. § 1983. *See* Doc. No. 34.[4],[5] The Defendants have now moved for summary judgment on all claims asserted against them. The Court will address each claim, and its applicability to each defendant, in turn.

### I. Claims under 42 U.S.C. § 1983

---

[2] Plaintiff voluntarily withdrew her claim for negligent training and supervision against the City. *See* Doc. No. 71-15.

[3] At oral argument, Plaintiff consented to the dismissal of the claims for malicious prosecution against all the Defendants. *See also* Doc. No. 71-15 (Plaintiff does "not contest a partial grant of summary judgment in favor of the City as to Plaintiffs' claims for…malicious prosecution); Doc. Nos. 69-13, 72-1, 73-1. Therefore, the Court will grant the Motions as to this claim.

[4] Together with the claims against the officers as individuals, Plaintiff has asserted various claims against the officers in their "official capacity." An "official capacity" claim against an individual is "essentially the same as a claim against the entity;" therefore, courts often hold they "should be dismissed as duplicative when the entity is also named as a defendant." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004); *see also Armstrong v. City of Greensboro*, 190 F. Supp. 3d 450, 463 2016) ("duplicative claims against an individual in his official capacity when the government entity is also sued may be dismissed"). In this action, Plaintiff has sued the City as well as the officers. Accordingly, the "official capacity" claims against the officers are duplicative and the Court will grant summary judgment on Plaintiff's claims against the officers in their official capacity.

[5] At oral argument Plaintiff's counsel argued that there was a NIED claim brought in Felicia Morgan's individual capacity. However, the Amended Complaint makes no allegations related to Felicia Morgan under the NIED claim. *See* Doc. No. 34, ¶¶ 119-130 ("As law enforcement officers with the Charlotte-Mecklenburg Police Department Defendants Gonzalez, Rud, Skipper, Ellis, and Jensen owed a duty of reasonable care not to inflict emotional harm upon Bobby [Morgan].").

Accordingly, the Court finds that there is no such claim but to the extent there ever was, the Court will grant the Defendants summary judgment due to lack of any evidentiary support for it.

Before reaching the merits of the Defendants' motions, the Court will briefly address two preliminary issues: (1) whether Plaintiff properly pled her claims under the Fourth Amendment; and (2) what evidence the Court may rely on in deciding the motions.

Rud and the City explicitly, and the other Officers implicitly, argue that Plaintiff did not allege an excessive use of force claim under the Fourth Amendment. *See* Doc. Nos. 57-1, 59-1, 61-1, 63-1. In general, the Federal Rules of Civil Procedure do not require a party to plead all its specific legal theories. At the same time, even "notice pleading" is designed to provide parties with fair notice of the claims against them and the grounds upon which those claims rest. *See Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), *abrogated on other grounds by Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Dove Air, Inc. v. Fla. Aircraft Sales, LLC*, 2011 U.S. Dist. LEXIS 88611, *12 (W.D.N.C. Aug. 9, 2011). Therefore, the well-established "liberal" pleading rules outlined by the Supreme Court cannot be construed so liberally as to deprive a party of notice. *See Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 Fed.Appx. 556, 563 (4th Cir. 2008) (unpublished). Put another way, the Court will not allow a party to raise a new argument at the summary judgment stage if the basis was not evident from the complaint. *See Duke Energy Fla., Inc. v. Westinghouse Elec. Co. LLC*, No. 3:14-cv-00141-MOC-DSC, 2016 U.S. Dist. LEXIS 134453, at *12 (W.D.N.C. Sep. 29, 2016).

Here, even though Plaintiff pled her claims under the Eighth and Fourteenth Amendments, rather than the Fourth Amendment, the first paragraph of the Amended Complaint states that Morgan's rights were violated because of "the application of excessive and unreasonable force." *See* Doc. No. 34 ¶ 1. The Amended Complaint also offers detailed allegations about the force used and the alleged unreasonableness of that force. *See generally* Doc. No. 34. Therefore, keeping in mind the well-established liberal pleading standard, the Court finds that the Amended Complaint

12

sufficiently put the Officers on notice of an excessive force claim despite the less than comprehensive drafting of Plaintiff's constitutional claims under Section 1983.[6,7]

Along with the sufficiency of Plaintiff's pleading, the Court must preliminarily address the applicable evidentiary standard. The summary judgment inquiry "unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (internal citations omitted). This inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof, *in the form of admissible evidence*, that could carry the burden of proof of his claim at trial." *Mitchell v. Data General Corp*., 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). On summary judgment the parties submit materials which create a record; and it is on that record only that the Court rules on summary judgment. Arguments or allegations lacking admissible evidentiary support fail to create a genuine issue of material fact. *See Rountree v. Fairfax Cnty. Sch. Bd.,* 933 F.2d 219, 223 (4th Cir. 1991) (citing *Celotex*, 477 U.S. at 324).

The record before this Court is lacking in several respects. In a case where the central allegation is that multiple officers unlawfully shot a man experiencing a mental health crisis there are no medical records or ballistic reports in the record. Whether the parties did not want this information in the record, or it was unavailable, its absence is notable. Furthermore, Plaintiff relies on her allegations in the Amended Complaint and unsworn statements by witnesses as "evidence" in her opposition to the Defendants' motions. However, this "evidence" is not evidence at all, and the Court will therefore disregard it in considering the motions. *See Celotex*, 477 U.S. at 324 (1986)

---

[6] Defendants conceded at oral argument that they were on notice of Plaintiff's intent to bring an excessive force claim under the Fourth Amendment.

[7] Despite Plaintiff's intransigence in continuing to argue that it is entitled to proceed with her Eighth and Fourteenth Amendment claims despite the absence of any credible support, the Court will dismiss her claims to the extent they were brought under the Eighth or Fourteenth Amendment.

("Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves...."). With these evidentiary parameters in mind, the Court can procced to the substance of the motions.

### a. Excessive Force claims against Rud, Gonzalez, and Skipper

While not a source of substantive rights, Section 1983 provides a vehicle to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States. *Albright v. Oliver*, 510 U.S. 266, 271, 114 S. Ct. 807, 127 L. Ed. 2d 114 (1994). The statute provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Thus, a case filed under 42 U.S.C. § 1983 provides potential remedial relief for a plaintiff who can prove that a person acting under color of state law deprived him of a right secured by federal law, including violations of federal constitutional rights, as well as certain limited federal statutory rights. *See Maine v. Thiboutot*, 448 U.S. 1 (1980); *Knibbs v. Momphard*, 30 F.4th 200, 214 (4th Cir.) (2022); *Hensley ex rel. North Carolina v. Price*, 876 F.3d 573, 580 (4th Cir. 2017). Here, Plaintiff alleges that the Officers used excessive force in using deadly force against Morgan rather than providing him with mental health assistance.

"The use of deadly force is a seizure subject to ... the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7 (1985); *Knibbs*, 30 F.4th at 214; *Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019). The Fourth Amendment permits the use of deadly force when a police officer "has probable cause to believe that a suspect poses a threat of serious physical harm, either to the officer

14

or to others." *Cooper v. Sheehan*, 735 F.3d 153, 159 (4th Cir. 2013); *Stanton v. Elliott*, 25 F.4th 227, 233 (4th Cir. 2022). "Whether an officer has used excessive force is judged by a standard of objective reasonableness." *Stanton*, 25 F.4th at 233 (quoting *Clem v. Corbeau*, 284 F.3d 543, 550 (4th Cir. 2002). Moreover, "recognizing that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—we take care to consider the facts from the perspective of a reasonable officer on the scene and avoid judging the officer's conduct with the 20/20 vision of hindsight." *Id.*; *Stanton*, 25 F.4th at 233 ("In questioning the split-second decisions of police officers, we must avoid hindsight bias and try to place ourselves in the heat of the moment.").

Therefore, to determine whether such probable cause exists, the Court must ask whether the Officers' use of deadly force was 'objectively reasonable in light of the facts and circumstances confronting them, viewed in the light most favorable to the Plaintiff, without regard to the officers' underlying intent or motivation. *Knibbs*, 30 F.4th at 214; *Hensley*, 876 F.3d at 582. The Court must focus on "the totality of the circumstances" based on the "information available to the officers 'immediately prior to and at the very moment [they] fired'" the shots. *Knibbs*, 30 F.4th at 214

For this inquiry, *Graham* instructs courts to evaluate three factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor* 490 U.S. 386, 396 (1989). But these factors are not "exclusive," and courts may identify other "objective circumstances potentially relevant to a determination of excessive force." *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473, 192 L. Ed. 2d 416 (2015). In this case, the key factor is whether the suspect posed an immediate threat to the safety of the Officers or others. *Graham*, 490

U.S. at 396. Because each officer was facing a unique situation the Court will evaluate each officer individually.

      1)   Officer Joshua Skipper

Plaintiff's excessive force claim against Officer Skipper falls at the first hurdle. Plaintiff concedes that Skipper did not shoot Morgan. *See* Doc. No. 69-13, p. 5 ("Bobby was ultimately struck in his facial area, neck, chest, and arm by at least three bullets from firearms from the Defendants Gonzalez and Rud."); Doc. No. 69-2, Bobby Morgan Depo., p. 98 (stating that he was shot after he had fired his firearm in the backyard and returned inside). This admission dooms Plaintiff's claim against Skipper. An officer does not seize an individual if the officer's show of force does not either physically touch the individual or compel him to submit to the officer's authority. *See California v. Hodari D.*, 499 U.S. 621, 626-27 (1991). Therefore, "no seizure occurs when a law enforcement officer shoots at a fleeing suspect but fails to hit him and halt his movement." *Gandy v. Robey*, 520 F. App'x 134, 141 (4th Cir. 2013); *accord Cabell v. Rousseau*, 130 F. App'x 803, 807 (7th Cir. 2005) (collecting cases for the proposition that "a number of circuits … [have] conclude[d] that no seizure took place where the officers' shots neither struck nor stopped the plaintiff"); *see also Est. of Rodgers ex rel. Rodgers v. Smith*, 188 Fed.App'x 175, 180-181 (4th Cir. 2006) (holding that although the officer fired his weapon, because no bullets struck the decedent, there is no seizure under the Fourth Amendment). In short, it is undisputed that Skipper did not shoot, or otherwise physically touch, Morgan. So, he could not have used excessive force under the Fourth Amendment because no seizure occurred. Skipper is therefore entitled to summary judgment on Plaintiff's excessive force claim.[8]

---

[8] A party may pursue a theory of bystander liability when an officer does not shoot or otherwise physically touch a plaintiff. "[A]n officer may be liable under § 1983, on a theory of bystander

Plaintiff attempts to salvage this claim by positing a "setting-in-motion" theory. Plaintiff argues that Skipper unreasonably discharged his weapon and if he had not "it likely would have prevented other Defendants from using deadly force." *See* Doc. No. 69-13, p. 13. Skipper's actions therefore were the "motivation" that led to Morgan's injury and are actionable under the Fourth Amendment. When asked by the Court for case law to support her argument, Plaintiff's counsel could not supply any. This is likely because the Fourth Circuit rejected this theory in *Gandy v. Robey,* 520 Fed.Appx. 134, 141 (4th Cir. 2013), where it held that it was "highly dubious in the excessive force context" and noted that an officers' "pre-seizure conduct, regardless of whether it was ill-advised or violative of law enforcement protocol, is generally not relevant for purposes of an excessive force claim under the Fourth Amendment." *Id*. Accordingly, Plaintiff's "setting-in-motion" theory is unsupported by the precedent of this circuit and does not save her claim against Skipper.

2) Officer Edward Gonzalez

Unlike Skipper, the Court finds there is evidence from which a reasonable jury could find that Gonzalez and Rud seized (i.e., shot) Morgan. See Doc. No. 57-9, p. 4. Having surmounted this initial hurdle, the question becomes whether the use of deadly force was reasonable in the totality of the circumstances. The Court will first focus on the actions of Gonzalez before turning to Rud.

The Court finds that the record supports a finding that Gonzalez' conduct was objectively reasonable, even viewing the evidence in the light most favorable to the Plaintiff. At the time

---

liability, if he: (1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Randall v. Prince George's County*, 302 F.3d 188, 203-04 (4th Cir. 2002). Plaintiff has not pursued this theory and even if she did there is no evidence to support a finding that Skipper had a reasonable opportunity to stop Rud or Gonzalez from firing their weapons.

Gonzalez fired his weapon, the situation undisputedly was as follows : (1) upon arrival at the scene Gonzalez was aware shots had previously been fired; (2) while taking up his initial position he heard another shot ring out; (3) Morgan appeared in the front window; (4) Gonzalez observed a silver pistol in Morgan's hand; (5) Officers were unaware if anyone else was in the residence; (6) Ms. Morgan arrived on scene and claimed Morgan did not have a gun; (7) Officers on scene were concerned with their positioning and the risk to civilians in the area; (8) Gonzalez heard shots being fired from the direction of the residence[9]; (9) an unknown officer radioed shots fired; (10) Morgan reappeared in the front window;  (11) Skipper radioed that Morgan had come out the back door, fired a shot, and refused a command to drop the weapon;  (12) Gonzalez observed muzzle flashes and heard "loud bangs" as Morgan discharge his weapon in the front window; and (13) Gonzalez fired a single round. *See* Doc. No. 60, exhibit 16 (Gonzalez body worn camera video); Doc. No. 61-6 (transcript of Gonzalez body worn camera video); Doc. No. 61-5 (Gonzalez Depo.); Doc. No. 60, exhibit 20 (Skipper body worn camera video). While the whole sequence of events took about forty-one minutes, the time between Morgan's exchange of fire with Skipper and Gonzalez discharging his weapon was less than two minutes (about 94 seconds). *See* Doc. No. 60, exhibit 16 (Gonzalez body worn camera video). The only evidence that Plaintiff offers to contradict this version of events is Morgan's testimony that although he fired his weapon "in the air," he did not point his gun at anyone. *See* Doc. No. 75-1 (Morgan Depo.) ("I never pointed a gun at anybody"). That said, the Court need not accept uncorroborated self-serving testimony as true. *See also Evans v. Tech. Applications & Serv. Co*., 80 F.3d 954, 962 (4th Cir. 1996) (holding that uncorroborated, self-serving testimony of a plaintiff cannot by itself create a material dispute

---

[9] The discharge of Morgan's firearm sounded so real that his counsel mistakenly identified a shot fired by Morgan as one fired by Officer Skipper during a replay of the body worn camera footage. *See* Doc. No. 57-7.

of fact sufficient to defeat summary judgment.). This is particularly true when other portions of a plaintiff's testimony are seriously called into question. The veracity of Morgan's testimony is seriously called in question due to his testimony that he did not discharge his weapon inside the residence despite the clear sound of non-CMPD gunfire on Gonzalez' body camera video. *See* Doc. No. 57-9; Doc. No. 60, exhibit 16 (Gonzalez body worn camera video)

Under these circumstances, it was objectively reasonable for Gonzalez to conclude that Morgan posed an immediate threat to his safety or the safety of others. *See Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001); *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991); *Craven v. Novelli*, No. 5:21-CV-00174-KDB-DSC, 2023 U.S. Dist. LEXIS 41990, at *17 (W.D.N.C. Mar. 12, 2023). This conclusion stands even if Morgan did not actually point his weapon at the Officers. In *Slattery* and *Anderson*, the Fourth Circuit found that despite an officers' mistaken belief that an individual possessed a firearm and was about to use it, a suspect's movements toward a perceived firearm while disobeying the officer's command not to do so "would rightfully cause a reasonable officer to fear that the suspect intended to cause imminent deadly harm." *See Slattery*, 939 F.2d at 215-16 (holding that an officer reasonably feared for his life after he twice ordered the suspect to put his hands up, but the suspect ignored those commands, instead reaching down to an area out of the officer's sight and grabbing an object that turned out to be a beer bottle); *Anderson*, 247 F.3d at 128, 131 (holding that an officer reasonably feared for his life during an investigation of a man thought to be armed after the officer ordered the man to get down on his knees and put his hands up, but the man began reaching in his back left pocket for what turned out to be a Walkman radio).

While this case is not fully analogous to *Slattery* or *Anderson*, those cases clarify a fundamental principle of excessive force jurisprudence. That is, the Fourth Amendment does not require omniscience. *See Anderson,* 247 F.3d at 132. Officers need not be absolutely sure of the

19

nature of the threat or the suspect's intent to cause them harm to act in self-defense. *Id.*; *Slattery*, 939 F.2d at 215-16; *see also McLenagan v. Karnes*, 27 F.3d 1002, 1007 (4th Cir. 1994) (holding that officer had a right to use deadly force when the officer had reason to believe the suspect was armed, although the officer could not confirm that the suspect was armed); *Greenidge v. Ruffin*, 927 F.2d 789, 792 (4th Cir. 1991) (affirming the entry of judgment for the officer although he could not confirm the nature of the weapon, which turned out to be a wooden nightstick, before using deadly force). Rather, officers need only have a sound reason to believe that there is a serious threat to their safety or the safety of others. *See Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996) ("Before employing deadly force, police must have sound reason to believe that the suspect poses a serious threat to their safety or the safety of others…[but] need not be absolutely sure… of the nature of the threat or the suspect's intent."). Here, even assuming Gonzalez was mistaken in his belief that Morgan pointed his weapon at the Officers, and Morgan simply indiscriminately discharged it multiple times, Gonzalez had sound reason to fear for his safety and the safety of others. *See Saucier v. Katz*, 533 U.S. 194, 206, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001) ("Officers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of" an immediate threat, and "in those situations courts will not hold that they have violated the Constitution.").

Gonzalez heard what sounded like live rounds of ammunition coming from Morgan's direction and was informed by another officer that Morgan had shot at him and refused a command to drop his weapon. Based on this information, a reasonable officer would have had probable cause to believe Morgan posed an immediate threat to the safety of the officers on scene. Gonzalez is therefore entitled to summary judgment on Plaintiff's excessive force claim.

     3) Officer Derek Rud

Rud was the last to fire on Morgan. When Morgan appeared in Rud's scope after all the events discussed above, he was forced to decide whether Morgan posed an immediate threat. A reasonable officer in this situation would have considered several factors suggesting that he was. Those would have included: (1) he was responding to a call of shots fired and a suspect who had barricaded himself inside a residence; (2) there was an active shooting taking place; (3) Morgan had exchanged gunfire with Officer Gonzalez a mere 4-5 minutes earlier; and (4) Morgan was in possession of what appeared to be a silver handgun and a flare gun. On the other hand, viewing the evidence in the light most favorable to Plaintiff, a reasonable officer would have also considered that Morgan was not pointing his weapon at an officer[10] and the lack of physical evidence to support a finding he was using a real firearm. However, because Rud reasonably, objectively believed his fellow officers were at risk, Rud did not have an unlimited amount of time to pause and ponder these differing factors. *See Graham*, 490 U.S. at 396-97 ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about

_____

[10] Aside from these undisputed facts, the parties dispute what Morgan was doing at the precise moment Rud fired his weapon. Rud testified in his deposition that when Officer Thompson was coming to relieve Gonzalez from his position, he saw Morgan in a shooting stance with his hands fully extended and pointing the firearm in the direction of the officers. *See* Doc. No. 57-6. Based on this threatening posture, Rud testified that he perceived an imminent threat of death or serious bodily injury and fired his weapon. Yet, Morgan testified that he did not take this threatening posture and he never pointed his gun at anyone. *See* Doc. No. 75-1. Rather, Morgan maintains that he was simply standing inside his home when he was shot. Without the aid of body camera videos, objective evidence, or other eye-witness testimony, the Court cannot appropriately reconcile this conflicting testimony on summary judgment. *See Summerlin v. Edgar*, 809 F.2d 1034, 1039 (4th Cir. 1987) ("Credibility of conflicting testimony is not, on a summary judgment motion, an issue to be decided by the trial judge"). Besides, Rud's subjective reasoning or intent is irrelevant. The Court decides whether his actions were objectively reasonable considering the undisputed facts and circumstances confronting him. *Graham*, 490 U.S. at 397. In short, the Court must determine whether Rud's use of force was objectively reasonable even if a jury were to believe Morgan as to his conduct at the moment Rud fired his weapon.

the amount of force that is necessary in a particular situation."). A prolonged pause may have resulted in Morgan discharging his weapon again or disappearing.

Taking into consideration all of these factors, including the tense, uncertain, and rapidly evolving nature of the situation, the Court finds that Rud had probable cause to believe Morgan posed an immediate threat to the safety of the officers on scene. The Constitution does not require officers to gamble with their lives or the lives of others in the face of a serious threat of harm. *Elliott* , 99 F.3d at 641. Neither does an officer have to wait until a gun is pointed at him before the officer can take action. *See McLenagan*, 27 F.3d at 1007. Rud faced a chaotic and ever-changing situation involving an armed, shooting suspect whom he reasonably believed could have caused serious injury to or killed an officer at any moment. Moreover, according to the best information available, the suspect had already attempted to injure/kill officers by discharging his weapon just minutes earlier. While it would of course be easier to play "Monday morning quarterback," Rud was forced to decide, in real time, whether an armed man, who had exchanged fire with officers, was an immediate threat. Again, the Fourth Amendment does not require omniscience. *See Anderson,* 247 F.3d at 132. And officers need not be absolutely sure of the nature of the threat or the suspect's intent to cause them harm to act in self-defense. *Id.* Based on what Rud knew at the time he fired his weapon and the other factors discussed, the Court finds that a reasonable officer would have believed Morgan posed an immediate threat to the safety of the officers on scene. The Court will therefore also grant Rud's Motion as to the excessive force claim.

### b. Qualified Immunity

Qualified immunity protects officials "who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). The doctrine balances two important

values— "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The Fourth Circuit has stated:

> The basic rules of § 1983 [qualified] immunity are well known. Underlying the doctrine is a desire to avoid overdeterrence of energetic law enforcement by subjecting governmental actors to a high risk of liability. The concerns behind the immunity defense are especially salient in the context of street-level police work, which frequently requires quick and decisive action in the face of volatile and changing circumstances. The law thus shields police officers from civil liability unless the officer reasonably should have known that his actions violated clearly established constitutional rights.

*Rowland v. Perry*, 41 F.3d 167, 172 (4th Cir. 1994) (citations omitted) (emphasis added); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam) (quotation omitted).

In conducting the qualified immunity analysis, a court's "first task is to identify the specific right that the plaintiff asserts was infringed by the challenged conduct." *Winfield v. Bass*, 106 F.3d 525, 530 (4th Cir. 1997) (en banc). The court then engages in a two-step inquiry, asking "whether a constitutional violation occurred" and "whether the right violated was clearly established" at the time of the official's conduct. *Melgar ex rel. Melgar v. Greene*, 593 F.3d 348, 353 (4th Cir. 2010). Courts have discretion to complete the two-step inquiry in either order. *Pearson*, 555 U.S. at 236.

The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition." *Saucier*, 533 U.S. at 195. As the Fourth Circuit has explained:

> It is not required, however, that a court previously found the specific conduct at issue to have violated an individual's rights. The unlawfulness of the officer's conduct need only be manifestly apparent from broader applications of the

23

constitutional premise in question. Put differently, a right may be clearly established if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct in question.

*E.W. by & through T.W. v. Dolgos*., 884 F.3d 172,185 (4th Cir. 2018) (citations omitted); *A.G. v. Fattaleh*, No. 520CV00165KDBDCK, 2022 U.S. Dist. LEXIS 124423, 2022 WL 2758607, at *8-9 (W.D.N.C. July 14, 2022).

In addition to asserting the lawfulness of their conduct, the Officers contend they are entitled to qualified immunity from the Plaintiff's claims. Under *Graham*, the law is clear that, as a general matter, a police officer must carefully measure the force used to respond to the particulars of a case, including the wrongdoing at issue, the safety threat posed by the suspect, and any attempt to evade arrest or flee. *See Graham*, 490 U.S. at 396. But the Supreme Court has emphasized that *Graham* is "cast at a high level of generality," *Plumhoff v. Rickard*, 572 U.S. 765, 778-79, 134 S. Ct. 2012, 188 L. Ed. 2d 1056 (2014) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004)), and does not by itself "create clearly established law outside 'an obvious case.'" *White v. Pauly*, 580 U.S. 73, 79-80, 137 S. Ct. 548, 196 L. Ed. 2d 463 (2017); E.W., 884 F.3d at 186;  *Craven*, No. 5:21-CV-00174-KDB-DSC, 2023 U.S. Dist. LEXIS 41990, at *29. As explained above, the Fourth Circuit has applied *Graham* in many cases, none of which would have given notice to the Officers that their conduct here would violate "clearly established law." The application of *Graham* to these circumstances was therefore uncertain. As a result, the Officers are entitled to qualified immunity, even if it were found that they committed a constitutional violation (which the Court does not find for the reasons stated above).

**c. Failure to Train/ Custom Reflecting Indifference Claims against the City.**

A municipality is considered a "person" and thus is subject to suit for a violation of Section 1983. *Monell v. Dep 't of Soc. Servs.*, 436 U.S. 658, 690 (1978); *Hunter v. Town of Mocksville, N.*

24

*Carolina*, 897 F.3d 538 (4th Cir. 2018). That said, "a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell*, 436 U.S. at 691. Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694.

Under *Monell*, four theories can be potentially pursued under Section 1983 to show a city's unlawful custom, policy, or practice: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train [employees], that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." *See Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003) (quoting *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999)).

Beyond identifying a policy or practice that may be attributable to the governmental unit, the plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. *See Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original). In other words, a plaintiff must show that the action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the action and the deprivation of federal rights. *Id.* Indeed, "[t]he first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

25

Thus, the Supreme Court has made clear that a Plaintiff seeking to impose *Monell* liability bears a heavy burden: "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." *Bd. of Cnty. Comm'rs of Bryan Cnty.*, 520 U.S. at 405 (citation omitted). The Fourth Circuit has similarly held that "[t]he substantive requirements for proof of municipal liability are stringent." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

Furthermore, under *Monell* a single incident is rarely enough to warrant municipal liability. "Proof of a single incident of the unconstitutional activity charged is not sufficient to prove the existence of a municipal custom." *Semple v. City of Moundsville*, 195 F. 3d 708, 713-14 (4th Cir. 1999). "At its core, the strict *Monell* test asks for some level of notice." *Est. of Jones v. City of Martinsburg*, 961 F. 3d 661, 672 (4th Cir. 2020). "A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents' ... nor is a showing that individual officers violated a person's constitutional rights on an isolated occasion ... sufficient to raise an issue of fact whether adequate training and procedures were provided." *Orpiano v. Johnson*, 632 F. 2d 1096, 1101 (4th Cir. 1980); citing *Withers v. Levine*, 615 F. 2d 158, 161 (4th Cir. 1980), and *McClelland v. Facteau*, 610 F. 2d. 693, 697 (11th Cir. 1979).

Plaintiff claims the City violated Morgan's constitutional rights under the third and fourth theories; that is, because of its failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens" and through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law." The City responds that Plaintiff has produced no evidence of 1) a specific training, policy or custom; 2) how such training, policy, or custom was defective; and 3) the causal link between the training or custom and Morgan's injury.

26

The Court agrees with the City. Plaintiff's pleadings are littered with references to the City's training and the Officers' alleged failure to heed their training. *See, e.g.,* Doc. No. 71-15 ("CMPD…offers Officers Crisis Intervention Training [] and also employs a Mobile Crisis Team that is available 24 hours a day and 7 days a week"); Doc. No. 69-13 ("Plaintiffs' expert opines that had Defendant acted as a reasonable officer operating within the scope of his training, it likely would have prevented other Defendants from using deadly force."); Doc. No. 74-14 ("Police officers of the Charlotte-Mecklenburg Police Department receive training to identify individuals they encounter who are suffering from mental illness and are in distress. Officers receive training to intervene and use their training to de-escalate crises involving subjects they identify are in distress. The roles of CMPD officers are detailed in the CMPD Interactive Directives Guide."). Yet, the training itself, not Officers' failure to follow it, must be the moving force of Morgan's injury. And, Plaintiff has failed to identify with any specificity the insufficiency of the City's training and the causal link to Morgan's injury. *See Craven*, No. 5:21-CV-00174-KDB-DSC, 2023 U.S. Dist. LEXIS 41990, at *37. Plaintiff merely asserts that because Officers allegedly did not follow their training it was *ipso facto* defective. However, this type of respondeat superior theory of liability is directly foreclosed under *Monell*.[11] In sum, Plaintiff has, by some distance, failed to

---

[11] Plaintiff offers *J. K. J. v. City of San Diego*, 17 F.4th 1247 (9th Cir. 2021) in support of her argument that officers' failure to follow their training can support a Section 1983 claim against a municipality. This proffer does not support Plaintiff for at least two reasons. First, the case reaches the opposite conclusion. The *J.K.J.* court affirmed the district court's dismissal of a *Monell* claim because "the allegations suggested that that the moving force behind the alleged constitutional violation was not a failure to train, but the officers' failure to heed their training." *J. K. J.*, 17 F.4th at 1251; *id.* ("J.K.J. failed to state a claim for municipal liability."). And second, because the decision has been vacated pending a rehearing en banc. *See J.K.J. v. City of San Diego*, 59 F.4th 1327 (9th Cir. 2023).

meet the high burden required to impose liability under *Monell*, and summary judgment will therefore be granted to the City on Plaintiff's *Monell* claim.[12]

## II.     Americans with Disabilities Act (ADA) Claim

Plaintiff argues that the City violated the ADA because it failed to: (1) train and supervise agents and employees to recognize and identify mentally ill persons; (2) train and supervise agents and employees to effectively communicate and interact with mentally ill persons; (3) adopt, implement, and enforce adequate policies and procedures to provide effective communication and interaction with mentally ill persons; (4) failed to provide Morgan with communication that was effective as the communication with the public; and (5) failed to allow Morgan Due Process and other law enforcement services, programs and other activities available to the public. Doc. Nos. 34, 71-15. The City responds that there was no duty to accommodate Morgan because he was communicating threats to his neighbors and discharging what looked like a real firearm, and Plaintiff identifies no accommodation that would be reasonable under the circumstances.

Title II of the ADA prohibits discrimination against individuals on the basis of disability by public entities, including when an individual is "excluded from the participation in or . . . denied the benefits of the services, programs, or activities of the public entity . . .." 42 U.S.C. § 12132; *A.G. v. Fattaleh*, 614 F. Supp. 3d 204, 240 (W.D.N.C. 2022). To establish a violation of the ADA, a plaintiff must show: (1) they have a disability; (2) they are otherwise qualified to receive the benefits of a public service, program, or activity; and (3) they were denied the benefits of such

---

[12] Plaintiff almost exclusively focuses her responsive pleading on the issue of the City's governmental immunity. *See* Doc. No. 71-15 ("Defendant attempts to argue the Monell liability as if it is the only legal avenue for imputing liability. However, in the present case, there still exists a genuine issue of material fact as to whether the City has waived its immunity by the purchase of liability insurance."). This argument is unsound because the City has never asserted governmental immunity. Plaintiff cannot manufacture an illusory issue to avoid summary judgment.

service, program, or activity, or otherwise discriminated against, on the basis of their disability. *See Constantine v. Rectors & Visitors of George Mason Univ*., 411 F.3d 474, 498 (4th Cir. 2005); *Nat'l Fed'n of the Blind v. Lamone*, 813 F.3d 494, 502-3 (4th Cir. 2016). "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Seremeth v. Bd. of Cty. Comm'rs Frederick Cty*., 673 F.3d 333, 336 (4th Cir. 2012). In the context of arrests, courts have recognized two types of Title II claims: (1) wrongful arrest, where police arrest a suspect based on his disability, not for any criminal activity; and (2) reasonable accommodation, where police properly arrest a suspect but fail to reasonably accommodate his disability during the investigation or arrest, causing him to suffer greater injury or indignity than other arrestees. *See Waller v. City of Danville*, 556 F.3d 171, 174 (4th Cir. 2009) (citing *Gohier v. Enright*, 186 F.3d 1216, 1220-21 (10th Cir. 1999)).

While it is undisputed that Morgan has a disability and is a "qualified individual," the parties dispute whether the City discriminated against Morgan based on his disability (i.e., the City failed to provide a reasonable accommodation). This analysis asks whether the Officers acted reasonably under the circumstances. At oral argument Plaintiff identified four times where an accommodation should have been offered but Officers failed to do so. Plaintiff argues that an accommodation should have been offered when: (1) Officers first arrived; (2) Officers first spoke with Morgan, and he dropped his firearm; (3) the first shots were fired; and (4) after Morgan had barricaded himself inside his residence. Plaintiff suggests the potential reasonable accommodations were the immediate seizure/arrest of Morgan, the calling of the crisis intervention team and mobile crisis unit, and Officers trying to talk to and induce Morgan to surrender. However, this argument misjudges the undisputed situation facing the Officers.

Based on Morgan's 911 call, this was an exigent circumstance from the start. While the Fourth Circuit has held that there is no separate exigent-circumstances inquiry under the ADA, the consideration of exigent circumstances is included in the determination of the reasonableness of the accommodation. *See Seremeth,* 673 F.3d at 339. The Officers faced an unstable situation at Morgan's residence. Upon receiving the service call, Officers were informed that Morgan, an armed man with a documented history of mental illness, was in a dispute with his neighbors. This information rendered mental health accommodations unreasonable until the scene was assessed and secured. *See Bates v. Chesterfield County*, 216 F.3d 367, 372 (4th Cir. 2000) ("[T]he volatile nature of a situation may make a pause for psychiatric diagnosis impractical and even dangerous."). After the initial contact, when CMPD tried to calm the situation and Morgan communicated with CMPD, he dropped what looked like a real firearm, threatened to blow his neighbors' heads off, and retreated inside his home. Morgan then fired what sounded like live rounds of ammunition multiple times. The discharge of apparently live ammunition escalated an already exigent circumstance into an active shooter situation. Officers need not, to avoid potential liability, endanger their own lives and the lives of others to accommodate an armed man simply because he has a history of mental illness. In short, despite Morgan's disability, he was first able to communicate with CMPD Officers without the need for an accommodation before retreating into his home, and the ensuing volatility of the situation rendered any further accommodation unreasonable.[13] *See Seremeth*, 673 F.3d at 340 (Courts "are reluctant to question the snap

_____

[13] Moreover, Plaintiff's suggested accommodations fail as a matter of law and fact. First, Plaintiff has offered no authority for the proposition that an arrest or seizure under the Fourth Amendment is an accommodation within the definition of the ADA. Second, Jenson Tilson (one of the first officers on the scene) was trained in Crisis Intervention. *See* Doc. No. 71-15. And lastly, officers attempted to obtain Morgan's phone number from his mother, but she refused to provide it to them and instead called Morgan herself, a call which went unanswered (and if Morgan did not pick up

judgments of law enforcement officials in situations in which a reasonable officer would fear for his safety and for the safety of those he is charged to protect.").

Furthermore, the Fourth Circuit has not recognized a "failure to train" claim under Title II of the ADA. *See Waller v. City of Danville*, 556 F.3d 171, 177 n.3 (4th Cir. 2009) ("Because we conclude that any duty of reasonable accommodation was met in these circumstances, we do not reach the question of whether the ADA supports a claim for failure to train. While plaintiff attempts to pose training in dealing with those with mental health problems as an "accommodation," it is well-settled that the failure to train must have caused some violation of law for an action against a municipality to lie."). Therefore, while the Fourth Circuit may recognize such a claim under the appropriate circumstances, *see Est. of Saylor v. Regal Cinemas*, *Inc.*, 54 F. Supp. 3d 409, 424 (D. Md. 2014), having found that the Officers acted reasonably given the circumstances, the Court need not answer Plaintiff's ADA "failure to train" question here.

### III. State-law Claims

#### a. Abandonment

When a non-movant fails to respond to an argument in a motion for summary judgment she is deemed to have abandoned that claim or waived any opposition to the argument. *See White v. Buckeye Fire Equip. Co*., No. 3:17-CV-404-MOC-DSC, 2018 WL 2304048, at *4 (W.D.N.C. May 21, 2018) ("[ having failed to respond to certain claims], plaintiff has abandoned these claims and defendant is entitled to summary judgment on each of them."); *see also Chamberlain v. Securian Fin. Grp., Inc*., 180 F. Supp. 3d 381, 405 (W.D.N.C. 2016) (granting summary judgment on a claim considered abandoned when plaintiff failed to respond to defendant's arguments in its

---

his mother's call it seems unlikely that he would have picked up a call from CMPD). *See* Doc. No. 63-1.

motion); *Talley v. City of Charlotte*, 2016 WL 8679235, at \*10 (W.D.N.C. 2016) (citing *Mentch v. Eastern Sav. Bank*, FSB, 949 F. Supp. 1236, 1247 (D. Md. 1997) ) (holding that a plaintiff "abandoned her harassment claim by failing to address that claim in her opposition to [defendant's] motion for summary judgment, or to offer clarification in response to [defendant's] reply brief"); *Grant-Fletcher v. McMullen & Drury, P.A*., 964 F. Supp. 2d 514, 525 (D. Md. 2013) (holding that plaintiff abandoned a claim "by not opposing [defendant's] Motion for Summary Judgment on the issue").

Aside from a perfunctory response to the City's motion on the issues of gross negligence and punitive damages, Plaintiff does not respond to any of the Defendant's arguments on the state-law claims. There is no analysis or discussion of the elements of these claims or substantive responses to Defendants' arguments. This omission may be forgiven for the battery claim, which rises and falls with the excessive force claim, but the other claims have particularized elements that go beyond whether the Officers used excessive force. Therefore, Plaintiff has abandoned her state law claims by failing to participate in the adversarial process. Accordingly, the Court will grant Defendants summary judgment on Plaintiff's state-law claims.

Notwithstanding this abandonment, the Court will below briefly discuss the substance of the state-claims, which fail as a matter of law in their own right regardless of Plaintiff's waiver.

### b. Public Official Immunity

Along with their defenses on the merits, the Officers argue that they are subject to public officials' immunity as to the state-law claims against them. The Court agrees. Under North Carolina law, "a public official, engaged in the performance of governmental duties involving the exercise of judgment and discretion, may not be held personally liable for mere negligence in respect thereto." *Smith v. State*, 289 N.C. 303, 331, 222 S.E.2d 412 (1976) (quoting *Smith v.*

*Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783 (1952)). This immunity has been recognized at common law for over a century. *See Epps*, 122 N.C. App. at 202, 468 S.E.2d 846. North Carolina courts have found police officers engaged in performance of their duties are public officials entitled to public official immunity. *Campbell v. Anderson*, 156 N.C. App. 371, 376, 576 S.E.2d 726 (2003).

That said, public official immunity is not absolute. Public officials' actions are not shielded if their actions were "(1) outside the scope of official authority, (2) done with malice, or (3) corrupt." *Wilcox*, 222 N.C. App. at 288, 730 S.E.2d 226. For that reason, it "is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." *Hensley v. Price*, 876 F.3d 573, 587 (4th Cir. 2017). Under North Carolina law, a law enforcement officer has a duty not to use deadly force upon another person unless, among other things, it is "reasonably necessary . . . [t]o defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force [or] [t]o effect an arrest[.]" N.C. Gen. Stat. § 15A-401(d)(1)—(d)(2). There is no allegation that the Officers acted outside the scope of their authority or corruptly, and so whether the Officers are entitled to public official immunity turns on whether they acted with malice.

The only argument that Plaintiff has advanced to show malice on the Officers' part is that they engaged in excessive force. Having already found that the Officers did not use excessive force, they consequently did not act with the malice required to pierce the shield of public official immunity. Nor is there any evidence before the Court to indicate that the Officers otherwise acted in bad faith. *See Leete v. Cty. of Warren*, 341 N.C. 116, 119, 462 S.E.2d 476 (1995) ("[i]t is well settled that absent evidence to the contrary, it will always be presumed 'that public officials will discharge their duties in good faith and exercise their powers in accord with the spirit and purpose

33

of the law.'") The Court finds therefore that the Officers are entitled to public official immunity and will dismiss all the state-law claims sounding in negligence against them.

### c. Battery

North Carolina law recognizes that a battery by a law enforcement officer may provide the basis for a civil action for damages so long as the plaintiff can show that the force used was excessive under the circumstances. *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 625, 538 S.E.2d 601 (2000) (citation omitted). In excessive force cases, a "parallel state law claim of assault and battery is subsumed within the federal excessive force claim and so goes forward as well" (or does not) if the federal claim survives summary judgment. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994). Having already found that Plaintiff's claims for excessive force do not survive summary judgment, the Plaintiff's claims for battery similarly fail as a matter of law.

### d. Intentional Infliction of Emotional Distress

The elements of intentional infliction of emotional distress are: "(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress." *Hogan v. Forsyth Country Club Co.*, 79 N.C.App. 483, 487-88, 340 S.E.2d 116, 119, *disc. review denied*, 317 N.C. 334, 346 S.E.2d 140 (1986). Conduct is extreme and outrageous when it is so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. *Smith-Price v. Charter Behav. Health Sys.*, 164 N.C. App. 349, 354, 595 S.E.2d 778, 783 (2004) (internal quotation and citation omitted).

In *Hensley v. Suttles*, 167 F. Supp. 3d 753 (W.D.N.C. 2016), in a situation in which deputies shot the plaintiffs' father right in front of them, this Court found that plaintiffs could not provide any evidence that the deputies intended to cause them severe emotional distress and therefore

dismissed the claim of intentional infliction of emotional distress. 167 F. Supp. 3d 753, 768 (W.D.N.C. 2016). Here, even assuming the Officers engaged in extreme and outrageous conduct (which the Court has found that they did not), Plaintiff has offered no evidence that the Officers intended to cause Morgan severe emotional distress. There is no evidence of any animosity toward Morgan which could be viewed as intended or calculated to inflict emotional distress. In fact, the body camera video, if anything, reflects a genuine concern for Morgan based on CMPD's prior positive encounters with him. If the *Hensley* plaintiffs' father being shot by deputies in their presence does not amount to intentionality or recklessness as to emotional harm, then this case falls well short of that bar.

Also, there is no evidence before the Court that Morgan has been treated for any mental or emotional condition *as a result* of the shooting. Morgan testified as to his schizoaffective disorder and bipolar disorder diagnosis, the medications he took pre-shooting, and the resumption of his treatment and medication post-shooting. *See* Doc. No. 74-1, p. 17-30. But the only testimony about a change in his condition post-shooting is that he was diagnosed with ADHD. *Id*., p. 26. Thus, there is no evidence before the Court that Morgan suffered severe emotional distress because of the Officers' conduct.

In sum, while Morgan suffered significant physical injuries, he has neither shown he suffered from severe emotional distress (as defined by North Carolina law) or any mental distress that is causally connected with Officers' conduct. The Court will therefore grant the Officers' motions for summary judgment as to the claims for intentional infliction of emotional distress.[14]

---

[14] Plaintiff's sole theory of liability as to the claims of intentional and negligent infliction of emotional distress against the City is respondeat superior. Under the respondeat superior doctrine, an employer may be held vicariously liable for its employee's misconduct in three situations: (1) when the misconduct is expressly authorized by the employer; (2) when the misconduct is

## IV.    ORDER

**NOW THEREFORE IT IS ORDERED THAT:**

1. Defendants' Joint Motion to Strike (Doc. No. 86) is **GRANTED**;

2. Derek Rud's Motion for Summary Judgment (Doc. No. 57) is **GRANTED**;

3. Joshua Skipper's Motion for Summary Judgment (Doc. No. 59) is **GRANTED**;

4. Edward Gonzalez's Motion for Summary Judgment (Doc. No. 61) is **GRANTED**;

5. The City of Charlotte's Motion for Summary Judgment (Doc. No. 63) is **GRANTED**[15];

6. Judgment is entered in favor of Defendants on Plaintiff's claims; and

7. The Clerk is directed to close this matter in accordance with this Order.

   **SO ORDERED ADJUDGED AND DECREED**.


Signed: June 13, 2023


Kenneth D. Bell
United States District Judge

---

committed within the scope of the employee's employment and in furtherance of the employer's business; or (3) when the misconduct is ratified by the employer. *White v. Consol. Planning, Inc*., 166 N.C. App. 283, 296, 603 S.E.2d 147, 157 (2004). It is axiomatic that when a court dismisses the underlying tort claim upon which a vicarious liability claim is based, the claim for vicarious liability must be dismissed as well. *See, e.g*., *Berkeley Fed. Sav. & Loan Ass'n v. Terra Del Sol*, 111 N.C. App. 692, 708, 433 S.E.2d 449 (1993)) ("[The claims] for vicarious liability necessarily fail since the underlying causes of action . . . fail."). Having dismissed the negligent infliction of emotional distress claims, the Court will also dismiss Plaintiff's claim of respondeat superior based on that claim.

[15] Having found that the City is entitled to summary judgment on all claims asserted against it, the Court need not, and does not, reach the question of whether Plaintiff has further met the high bar for a recovery of punitive damages.

36